IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

:

NED CASTOR,

     Plaintiff,

              v.

GREATER DAYTON
REGIONAL TRANSIT
AUTHORITY,

     Defendant.

:

:         Case No. 3:22-cv-151

         Judge Walter H. Rice

:

:

---

ORDER SUSTAINING DEFENDANT GREATER DAYTON REGIONAL
TRANSIT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT (DOC.
#16); JUDGMENT SHALL ENTER IN FAVOR OF DEFENDANT AND
AGAINST PLAINTIFF NED CASTOR; TERMINATION ENTRY

---

Plaintiff Ned Castor, a former employee of Defendant Greater Dayton Regional

Transit Authority ("RTA" or "GDRTA"), has sued Defendant, arising from an alleged

failure to accommodate a disability and wrongful termination. (Compl., Doc. #4).

Defendant has filed a Motion for Summary Judgment on all claims. (Doc. #16). For the

reasons set forth below, the Motion is SUSTAINED.

## I. Factual Background and Procedural History

Plaintiff began working for Defendant in March 2015, starting as a paratransit

driver but quickly becoming a "fixed route operator"—*i.e.*, driving GDRTA buses that run

on specified routes.  (Castor Depo. and Exs., Doc. #16-2[1], PAGEID 205-06).  Fixed

routes use diesel buses, electric trolleys, and NexGen electric trolleys, the last of which

run on both electrified overhead wires and have power stored in batteries so that they

may run on roads that do not have overhead wires.  (Aff. of Robert Stevens, Doc. #16-1,

¶¶ 4-6, PAGEID 113).  For trolleys, operators must reattach the electrical lines on top of

the bus to the overhead wires, a maneuver which is accomplished by pressing a button

or using "a rope with a spring tension to connect to the wire.  The maneuver does not

require lifting, reaching over head [*sic*], or any physical exertion."  (Doc. #16, PAGEID

87, quoting Doc. #16-1, PAGEID 114, ¶ 8; citing Doc. #16-2, PAGEID 211).  However,

"[t]his process requires the operator to use 20-25 pounds of force."  (Memo. in Opp.,

Doc. #18, PAGEID 703, citing Doc. Prod., Doc. #18-1, PAGEID 725, 728-33).  At all

relevant times, Plaintiff was a member of the Amalgamated Transit Union ("ATU") and

subject to the collective bargaining agreement ("CBA") between Defendant and the

ATU.  (*Id.* at PAGEID 114, ¶ 9; Doc. #16-2, PAGEID 206).  The CBA dictated that

decisions as to which drivers operated which routes would be determined by drivers,

three times per year, bidding on certain routes based on seniority.  While some routes

are diesel-only and some routes are trolley- or NexGen-only, drivers may be forced, via

mandatory overtime, to drive any type of bus.  Accordingly, "[a]t all times during the

union and the GDRTA's relationship, both parties expected that all employees be able

to operate each type of vehicle in service."  (Doc. #16-1, PAGEID 114, ¶ 12).

---

[1] Plaintiff's deposition, unlike the other depositions filed in the case (Doc. #19-1, 19-2, 19-3), does not contain a certificate of authenticity from the court reporter, as is usually required to authenticate the deposition as a summary judgment exhibit. *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009), quoting *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002).  However, there is no dispute over the authenticity of the copy filed by Defendant, and both parties rely on that copy in their respective briefings.  Thus, the Court will consider the deposition's contents.

Plaintiff drove for Defendant for four years without incident, absent one injury in October 2016, in which he hurt his back attempting to get a wheelchair passenger unstuck from the chair lift. (IME Report, Doc. #18-2, PAGEID 737). He accumulated sufficient seniority that he was always able to bid on a diesel-only route. During that time, Plaintiff made at least five requests for time off under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*., all of which Defendant granted. (Doc. #16-2, PAGEID 208, 213, 220, 235, 236-37). However, on April 11, 2019, believing Defendant to be understaffed and worried that he might get forced onto a trolley route, Plaintiff requested an accommodation to drive only diesel buses so that he would not have to lift the trolley wires onto the overhead lines. This accommodation was denied. (Doc. #19-1, PAGEID 787). In the letter denying accommodations, Defendant stated that the request was not ripe, as Plaintiff was driving a diesel-only route at the time. Defendant also reminded Plaintiff that, as a driver, he was expected to be able to drive diesel buses, electric trolleys, and NexGen trolleys at any time. (*Id*. at PAGEID 788). Despite "the fact that . . . Castor could be given a mandatory assignment at any time (including same-day overtime assignments) that conflicted with his disability[,]" Defendant ordered Plaintiff to return to work, which he did. (Doc. #18, PAGEID 705, citing Doc. #16-2, PAGEID 209; Doc. #19-1, PAGEID 788).

Plaintiff continued to work, driving diesel-only routes, even after he was diagnosed with cervical spondylosis and cervical radiculitis in May and June 2019, respectively. (*Id*. at PAGEID 704, citing Doc. #16-2, PAGEID 234). On June 17, 2019, Plaintiff filed a disability discrimination charge with the Ohio Civil Rights Commission ("OCRC") over his denial of request for a diesel bus-only accommodation, which the

3

OCRC dismissed on March 12, 2020. (Doc. #16-2, PAGEID 278, 312). Despite Plaintiff complaining that his spondylosis and radiculitis were impacting his ability to perform the functions of his job (Doc. #18, PAGEID 704-05), on August 20, 2020, Plaintiff's examination by a Department of Transportation medical examiner "explicitly found that Castor's cervical range of motion was within functional limits." (Doc. #16, PAGEID 90-91, citing Doc. #16-2, PAGEID 626).

"On or around the first week of December 2020, Castor was mandated for overtime." (Doc. #16-1, PAGEID 115, ¶ 17). While Plaintiff had not been assigned any particular route yet, in anticipation that Plaintiff might need to operate a NexGen trolley on an overtime route, Defendant scheduled Plaintiff for NexGen training on December 7, 2020. Plaintiff did not want to take the training, asserting that his impairments meant that he could only drive diesel buses. (*Id*. at ¶¶ 18-19). On December 15, 2020, Plaintiff requested an accommodation to ensure that he would only have to drive diesel buses. Defendant deferred decision on the accommodation until Plaintiff could provide documentation. The next day, Plaintiff was required to pick a route under the CBA, and he picked a diesel route. (Doc. #16-2, PAGEID 214-15). Also on December 16, Plaintiff gave Defendant records of the May and June 2019 diagnoses of cervical spondylosis and cervical radiculitis. (*Id*. at PAGEID 215; Doc. #16-3, PAGEID 629). A meeting between Plaintiff and Defendant was scheduled for January 7, 2021, to discuss Plaintiff's conditions and potential accommodations for him; due to COVID, the meeting never took place. (*Id*.).

On January 4, 2021, Plaintiff's attorney, Jason Matthews, submitted a letter to Defendant, "request[ing] that the RTA not assign [Plaintiff] to electric trolleys as an

accommodation for his alleged disability." (Doc. #16-2, PAGEID 382). Defendant responded by placing Plaintiff on unpaid medical leave on February 26, 2021. (*Id*. at PAGEID 219). Plaintiff and the ATU filed a grievance challenging his leave placement; the ATU voted to arbitrate the grievance with Defendant. (*Id*. at PAGEID 221). Prior to the arbitration hearing scheduled for September 2021, Defendant and the ATU reached a settlement by which Plaintiff would return to work on a diesel-only route. However, because the settlement did not guarantee that Plaintiff could not be required to drive a trolley or NexGen trolley in forced overtime, Plaintiff refused to sign the settlement. Subsequently, the ATU withdrew the grievance. (*Id*. at PAGEID 221-22, 224; Doc. #16-3, PAGEID 656). Meanwhile, on June 18, 2021, Plaintiff filed a second disability discrimination charge with the OCRC, based on Defendant's alleged denial of his diesel-only accommodation proposal. The OCRC dismissed the charge for lack of probable cause on February 10, 2022. (Castor Depo. Exs., Doc. #16-3, PAGEID 696-700).

Throughout 2021, Plaintiff remained on leave. However, after Plaintiff refused to sign the settlement agreement, pursuant to the CBA, Defendant required him by October 7, 2021, either to be examined by a neutral, independent medical source (*i.e.*, a "third opinion"), or to return to work. (Doc. #16, PAGEID 93, citing Doc. #16-1, PAGEID 137, art. XI, § 1-F; Doc. #16-3, PAGEID 657). On September 22, 2021, Plaintiff refused to bid on any routes because even the ostensibly diesel-only "runs were subject to change." (Doc. #16-2, PAGEID 16-2, PAGEID 222). On September 27, 2021, Plaintiff submitted to Defendant a note from his physician assistant who had diagnosed him with cervical radiculitis; therein, the physician assistant stated that Plaintiff could return to

5

work if he could be guaranteed only to drive diesel buses. (Doc. #16-3, PAGEID 644). On October 13, 2021, Thomas Lieser, M.D., the independent doctor chosen by Defendant, examined Plaintiff and reported that the "examination revealed multiple inconsistencies and symptom amplification with lack of effort." (*Id*. at PAGEID 661). Dr. Lieser found no evidence of cervical radiculitis or other objective evidence of severe impairment, and concluded that Plaintiff was histrionic during the examination, such that his subjective complaints of pain and injury were unreliable. (*Id*.). Dr. Lieser opined that Plaintiff could operate trolleys with no difficulty, including attaching or reattaching the poles on electric and NexGen trolleys. (*Id*. at PAGEID 661-62). Upon receiving Dr. Lieser's report, Defendant ordered Plaintiff to return to work on October 27, 2021. (Doc. #16-1, PAGEID 115, ¶ 21).

On October 27, 2021, Plaintiff submitted a letter from a physician assistant, Katrina Burgos, who stated that Plaintiff indeed had cervical radiculitis, and that he needed his leave extended until November 12, 2021, "due to the fact that he is still waiting to get imaging done and that his health is declining." (Doc. #16-1, PAGEID 192). In response to the letter, and because Plaintiff had not submitted the name of the physician from whom he would seek an additional opinion, Defendant kept Plaintiff on leave and ordered him to choose no later than November 5, 2021, a medical doctor and psychologist from a list furnished by Defendant for additional examination. (Doc. #16-3, PAGEID 663). Defendant later extended this deadline to November 19, 2021. (*Id*. at PAGEID 687). Plaintiff's clinical counselor sent an email to Defendant detailing Plaintiff's mental health symptoms and requesting that his leave be extended (*id*. at PAGEID 686), but Plaintiff failed to select from the list of providers for examination.

6

Consequently, Defendant ordered Plaintiff to be examined by D.S. Long, M.D., and Michael Murphy, Ph.D., on December 1 and 13, 2021, respectively. (*Id.* at PAGEID 671, 687).

Plaintiff, despite attempting to phone Dr. Murphy's office several times, was unable to reach anyone who could confirm the location of the office. Thus, he informed Defendant that he could not attend the December 13, 2021, appointment. (Doc. #18, PAGEID 707, citing Doc. #16-2, PAGEID 228; Doc. #19-1, PAGEID 854). After examining Plaintiff, Dr. Long concluded: "I see no evidence of any cervical radiculitis upon my evaluation. There are no ongoing radicular symptoms. . . . It is my opinion that based upon my evaluation he would be able to attach and reattach poles on electric trolleys." (Doc. #16-3, PAGEID 679). On December 10, 2021, after receiving Dr. Long's report, "[t]he GDRTA directed Castor to contact them and set up a return to work testing." (Doc. #16, PAGEID 95, citing Doc. #16-3, PAGEID 682). Plaintiff never set up this testing; rather, on December 16, 2021, Chad Kennedy, a nurse practitioner, informed Defendant that Plaintiff was being treated for depression, anxiety, sleeplessness, and chronic shoulder pain, and asked that Plaintiff be allowed to remain on leave until after January 16, 2022. (Doc. #19-1, PAGEID 852). Defendant nonetheless denied the instant accommodation request, due to his failure to attend the appointment with Dr. Murphy. (Doc. #16-3, PAGEID 686).

On January 4, 2022, Defendant sent a letter to Plaintiff, informing him that he had repeatedly violated Article XI, Section F of the CBA, he was not entitled to additional leave, and he was scheduled for a predetermination and investigative hearing on January 18, 2022. (Doc. #16-3, PAGEID 687). The day after the hearing, Defendant

7

informed Plaintiff that, based on his lack of objective symptoms, refusal to bid on a diesel-only route, and failure to attend the appointment with Dr. Murphy he was terminated effective immediately. (Doc. #19-1, PAGEID 798-99). Plaintiff, through the ATU, filed a grievance against Defendant regarding his termination, alleging that Defendant had violated Articles VIII, XXX, and XXXI of the CBA. After a series of three hearings in February and March 2022, in which Defendant concluded that there was no CBA violation, the ATU withdrew the grievance. (Doc. #16-3, PAGEID 692-95).

On May 3, 2022, Plaintiff filed suit in the Montgomery County, Ohio, Court of Common Pleas, alleging that Defendant had: engaged in disability discrimination, in violation of Ohio Revised Code §§ 4112.02, 4112.99 (Claim One) and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, *as amended by* ADA Amendments Act of 2008, Pub. L. 110-325 ("ADAAA") (Claim Two); failed to accommodate his disability in violation of the ADA and Ohio state law (Claim Three); and retaliated against him in violation of the FMLA (Claim Four). (Doc. #4). Defendant removed the case to this Court (Notice, Doc. #1), and on May 1, 2023, filed the instant Motion.

## II.    Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always

8

bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings," and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

"Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A CHARLES ALAN

9

WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE CIVIL § 2726 (3d ed. 1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. FED.R.CIV.P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). If it so chooses, however, the court may also consider other properly presented materials in the record. FED.R.CIV.P. 56(c)(3).

## III.    Analysis

### A.    Exhaustion

In its Answer, Defendant asserted that "Plaintiff's claims are barred, in whole or in part, because he failed to exhaust administrative or contractual remedies and/or to satisfy administrative prerequisites prior to the initiation of this action." (Doc. #5, PAGEID 57). In its Motion, Defendant notes that exhaustion of administrative remedies has always been required under federal law and has been required since April 15, 2021, under Ohio law. (Doc. #16, PAGEID 97-98, citing 42 U.S.C. § 2000e-5(e); OHIO REV. CODE § 4112.052; *Jones v. Nat. Essentials, Inc.*, 740 F. App'x 489, 492 (6th Cir. 2018)). While Plaintiff filed charges and exhausted remedies with respect to alleged disability discrimination, Defendant asserts that Plaintiff was required to file a new or amended charge with the OCRC or Equal Employment Opportunity Commission ("EEOC") with respect to his termination prior to filing suit. Yet, he did not do so. Consequently, Defendant argues, Claims One through Three must be dismissed to the extent they

10

pertain to Plaintiff's termination, and Claim Four, an FMLA claim relating only to his termination, must be dismissed in its entirety. (*Id*. at PAGEID 98).

Plaintiff argues that he "properly exhausted his administrative remedies regarding his termination because the termination was based on Defendant's failure to provide his reasonable accommodation and allow him to return to work. As such, this claim is ripe for consideration by this Court." (Doc. #18, PAGEID 715). However, as Defendant correctly notes, Plaintiff "does not offer any factual or legal support" for this conclusory argument. (Reply, Doc. #22, PAGEID 1053). Defendant is also correct, (*id*. at PAGEID 1053-54), that for a new adverse action to relate back to the initial discrimination or retaliation charge, and thus not necessitating a new charge being filed, the new action must "reasonably grow out of the facts and claims [Plaintiff] asserted" in previous charges. *Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853 (6th Cir. 2000).

The two charges Plaintiff filed with the OCRC are factually similar—in June 2019, discrimination based on a failure to accommodate his alleged disability, and in June 2021, disability discrimination and retaliation for requesting an accommodation. (Doc. #16-2, PAGEID 278; Doc. #16-3, PAGEID 696). Plaintiff's termination, on the other hand, arose from his alleged refusal to comply with the CBA through failing to participate in the independent medical examination process, refusing to bid on a diesel-only route, and being absent without leave from work. (Doc. #16-3, PAGEID 687; Doc. #19-1, PAGEID 798-99). A failure to show up for work or to bid on a route that does not implicate the alleged disability cannot reasonably be said to have grown out of the facts and claims of previous charges, and Plaintiff offers no caselaw suggesting that a termination for a CBA violation would relate back to individual disability discrimination.

11

Further, as the termination occurred after April 15, 2021, Plaintiff was required to exhaust his termination as a retaliation claim through a charge with the OCRC or EEOC. Accordingly, Claims One, Two, and Three are dismissed with prejudice to the extent they arise from his termination, as any attempt to exhaust the termination would be time-barred. *See* 42 U.S.C. § 12117(a), incorporating 42 U.S.C. § 2005e-5(e)(1) (ADA claimant must file an EEOC charge within 180 days of the adverse action, with that deadline extended to 300 days if he has filed a charge with a state agency); OHIO REV. CODE § 4112.051(C)(2) (charge regarding employment discrimination must be filed with OCRC within two years of the allegedly unlawful action).

The only adverse action alleged in Claim Four, FMLA retaliation, is his termination, and it is undisputed that every time that Plaintiff properly sought FMLA leave, Defendant granted it. (Doc. #4, PAGEID 45, ¶ 81; Doc. #16, PAGEID 109 (internal citation omitted)). Unlike the ADA, the FMLA does not expressly incorporate the exhaustion requirement of Title VII of the Civil Rights Act of 1964. While the Supreme Court, the United States Court of Appeals for the Sixth Circuit, and this Court have not specifically opined on whether exhaustion is required under the FMLA, several District Courts that have examined the issue have held that it is not. *See, e.g.*, *Cruz-Packer v. Dist. of Columbia*, 539 F. Supp. 2d 181, 190 (D.D.C. 2008); *Krohn v. Frosting*, 11 F. Supp. 2d 1082, 1086 (E.D. Mo. 1998). The Court need not address this matter of first impression because, as discussed below, Claim Four fails as a matter of law.

### B. Claims One through Three: Disability Discrimination and Failure to Accommodate

#### 1. Legal Standards

The legal standards for disability discrimination (Claims One and Two) and failure to accommodate (Claim Three) are identical under both Ohio and federal law, and thus are equally applicable to Claims One through Three to the extent they arise under the ADA or Ohio antidiscrimination law. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 872 (6th Cir. 2007). For disability discrimination, a plaintiff must make a *prima facie* showing that he: (1) is legally disabled; (2) is otherwise qualified to perform the job notwithstanding his disability; (3) suffered an adverse employment action; and (4) was replaced by a nondisabled person. If a plaintiff makes that showing, then the burden shifts to the defendant employer to proffer a legitimate, nondiscriminatory reason for the adverse action. If the defendant does that, then then the burden returns to the plaintiff to show that the defendant's proffered reason is pretextual. *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000), citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

For failure to accommodate, a plaintiff must make a *prima facie* showing that he: (1) is legally disabled; and (2) is otherwise qualified for the position – (a) without accommodation; (b) with an "essential" job requirement eliminated; or (c) with a reasonable accommodation by the employer. *Kleiber*, 485 F.3d at 869. If a plaintiff makes such a showing, then the burden shifts to the employer to show that (a) "a challenged job criterion is essential, and therefore a business necessity"; or (b) "a proposed accommodation will impose an undue hardship[.]" *Id.*

13

## 2. Disability Discrimination and Failure to Accommodate

Defendant argues that Plaintiff cannot make a *prima facie* showing because he is not legally disabled, cannot perform all functions of the job, has not made a reasonable accommodation request, and cannot show disparate treatment. (Doc. #16, PAGEID 100-09). *First*, Defendant claims that Plaintiff "never claimed or presented evidence substantiating his claim that his alleged neck or shoulder disabilities impaired his ability to perform major life activities." (*Id*. at PAGEID 101). While several medical providers concluded that Plaintiff could not attach or reattach the trolley poles, they did not explain *how* any of Plaintiff's physical impairments prevented him from "complet[ing] the minimal physical effort required to attach or reattach electric trolley poles." (*Id*.) Indeed, Plaintiff testified that no doctor had placed any limit on his ability to lift or push, and could think of virtually no area of daily activity in which he was limited due to cervical spondylosis or cervical radiculopathy. (*Id*. at PAGEID 101-02, quoting Doc. #16-2, PAGEID 234). Further, independent medical and occupational sources concluded that there was no reason Plaintiff could not attach and reattach the poles, and Plaintiff was repeatedly cleared to return to work without restrictions. (*Id*. at PAGEID 102-03, citing Doc. #16-3, PAGEID 587-91, 624-27, 652-55, 658-62, 678-81).

*Second*, Defendant claims that Plaintiff cannot show that he can perform all essential functions of the job without accommodation, with essential functions defined as "fundamental job duties of the employment position the individual with a disability holds." (Doc. #16, PAGEID 103 (internal quotation marks omitted), quoting 29 C.F.R. § 1630.2(n)(1)). Defendant argues that it is undisputed that "several GDRTA documents, including the job description, state that an essential job function includes either

14

attaching or reattaching poles, lifting up to 50 pounds, moving one's arms, performing simple, on the spot repairs, and other similar language[,]" and that the CBA requires drivers to be able to operate all buses and trolleys at all times. (*Id.* at PAGEID 103-04, citing Doc. #16-1, PAGEID 145, 171-87).

*Third*, Defendant showed why Plaintiff's initial proposed accommodations of only driving diesel routes, or having another GDRTA employee ride with him to attach or reattach poles, were unreasonable—doing so would violate the CBA or foist an essential function of his job onto another employee, respectively—and Plaintiff never proposed an alternate accommodation. Thus, Defendant asserts, Plaintiff has not met any of his *prima facie* elements, and Defendant is entitled to judgment as a matter of law on Claims One through Three. (Doc. #16, PAGEID 104-07).

Plaintiff counters that, while Defendant's and independent medical examiners did not diagnose Plaintiff, Plaintiff's doctors diagnosed him with shoulder impairments. Also, contrary to Defendant's assertion that his injuries did not impact major life activities, Plaintiff testified that the shoulder pain impacted his ability to push, pull, and lift, the latter of which is a major life activity under federal regulations. (Doc. #18, PAGEID 710, quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 452 (6th Cir. 2007); citing 29 C.F.R. § 1630.2(i)(1); Doc. #16-2, PAGEID 234). Finally, Defendant's representative conceded that diesel and electric buses have the same capacity, and he was unsure as to whether there is a difference in cost of operation. Thus, Plaintiff driving a diesel bus every time, even on a trolley route, would not violate the CBA, but rather, would be a mere equipment accommodation, which is expressly contemplated under the ADA as a reasonable accommodation. (Doc. #18, PAGEID 711-12, citing 42

U.S.C. § 12111(9)(B)). Thus, Plaintiff concludes, he has met his *prima facie* burden, and Defendant must show that the proposed accommodation would create an undue hardship. (*Id.* at PAGEID 712, quoting *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998)).

Defendant rejoins that the CBA requires that all operators be able to drive electric buses, and the job description states that lifting up to fifty pounds is an essential function of the job. (Doc. #22, PAGEID 1054-55, citing Doc. #16-1, PAGEID 114, 173 ¶¶ 10, 12). Thus, assuming *arguendo* that Plaintiff is disabled, he has not shown that he can perform the essential functions of fixed route operator. Moreover, there is no evidence that Plaintiff ever specifically requested to drive diesel buses on trolley routes, much less that such an accommodation would be reasonable. (*Id.* at PAGEID 1055-56, quoting *Kleiber*, 485 F.3d at 870; *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)). "Since Castor failed to show that he proposed a reasonable accommodation for his disability, he cannot show that he is qualified for the job and his claims for disability discrimination and failure to accommodate fail." (*Id.* at PAGEID 1055, citing *Jakubowski*, 627 F.3d at 202).

A disability under federal and Ohio law is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A-C); *see also, e.g.*, *Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 666 n.6 (S.D. Ohio 2013) (Sargus, J.) (Noting that Ohio and federal definitions of disability are functionally identical since the enactment of the ADAAA). "Substantially limits," in turn, is defined as the significant restriction of:

16

> [T]he ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii). "Major life activities include, but are not limited to: Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]" 29 C.F.R. § 1630.2(i)(1)(i). "Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment[;] (iii) Written job descriptions[; and] (v) The terms of a collective bargaining agreement[.]" 29 C.F.R. § 1630.2(n)(3). Finally, "the term "reasonable accommodation" may include":

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)

The Court is mindful that for an ADA claim, summary judgment at step one of the burden-shifting analysis is rarely appropriate, as a plaintiff's "burden of making out a *prima facie* case is not an onerous one." *Blanchet v. Charter Comm'ns*, 27 F.4th 1221, 1228 (6th Cir. 2022) (internal quotation marks and citation omitted). Also, Plaintiff is correct that the conflicting evidence regarding his physical impairments creates a triable issue of fact as to whether he is disabled under the ADA. However, even assuming *arguendo* that Plaintiff is disabled, he has not designated evidence that he is otherwise

17

qualified for the position despite the disability. As discussed above, Plaintiff may show he is otherwise qualified as a route operator by showing that he can perform the job: (a) without accommodation; (b) with an essential job requirement eliminated; or (c) "with a proposed reasonable accommodation." *Id.*, quoting *Kleiber*, 485 F.3d at 869. The CBA is unambiguous that a driver must be able to operate diesel, electric trolley, and NexGen routes at any time. (Doc. #16-1, PAGEID 171). As Defendant notes, the fixed route operator job description also requires drivers to lift up to fifty pounds and be able to operate "*all* RTA buses, Trams, and Wright Flyers in a safe manner." (Doc. #16-1, PAGEID 173, 180 (emphasis added)). Plaintiff offers no evidence that Defendant or the ATU ever waived or modified these requirements, and by his own admission, he cannot lift anywhere close to fifty pounds or even reach up to attach or reattach the trolley poles. (Doc. #16-2, PAGEID 234). Thus, Plaintiff cannot show that he is qualified for the job without accommodation.

As to accommodation, Plaintiff arguably offered two: (1) guaranteeing that he would never have to operate a trolley; and (2) "having someone assist [him] taking the poles on and off the trolley[.]" (Doc. #16-2, PAGEID 234). As discussed above, it is unclear from his testimony whether Plaintiff ever specifically requested that Defendant guarantee that he be provided with a diesel bus in the event he was assigned a trolley route (*id.* at PAGEID 209-10), but even construing the testimony to conclude that Plaintiff made such a request, neither proposed accommodation was reasonable. It is established law in this Circuit that a purported accommodation requiring the employer to transfer part of one's job responsibilities, *e.g.*, attaching and reattaching poles, to another employee is unreasonable. *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d

18

719, 729 (6th Cir. 2000). As to the purported "diesel bus on a trolley route" proposed accommodation, Plaintiff has not shown that, *e.g.*, Defendant has extra diesel buses available, such that setting aside a diesel bus for him any time he was scheduled to drive would not disrupt Defendant's operations or the seniority structure set forth in the CBA. Thus, the proposed accommodations are unreasonable on their face, made even more so by the fact that mandatory overtime is scheduled only one day in advance and that Defendant had been consistently short-staffed since 2019. (Tamara Finch Depo., Doc. #19-3, PAGEID 997). Allowing Plaintiff to drive only *diesel buses* may well have resulted in his only driving *diesel routes*, which would have infringed on the seniority rights of other ATU members. Again, a proposed accommodation that infringes upon seniority rights is unreasonable. *Kempter v. Mich. Bell Tel. Co.*, 534 F. App'x 487, 492 (6th Cir. 2013), quoting *US Airways, Inc. v.* Barnett, 535 U.S. 391, 405 (2002). As Plaintiff has produced no evidence that his proposed accommodations are even possible, much less reasonable, he cannot show that he is qualified through the "reasonable accommodation" prong.

Finally, Plaintiff does not argue that he can meet the "essential requirement eliminated" prong; nor could he reasonably do so. As discussed above, the job description and CBA are unambiguous that attaching and reattaching electric poles is an essential portion of the job requirement that operators be able to drive all buses and trolleys at all times. Were this requirement removed, it could violate the CBA by forcing more senior drivers to drive routes on which they did not bid, or require them to drive a trolley route on overtime when they would not otherwise have been forced into mandatory overtime.

As Plaintiff has not shown that he is otherwise qualified as a route operator, he has not met his *prima facie* burden under Ohio and federal law as to disability discrimination or failure to accommodate. *See Rector v. Ohio Bur. of Workers' Comp.*, 10th Dist. Franklin No. 09AP-812, 2010-Ohio-2104, ¶¶ 11-12 (May 13, 2010), citing *Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 573 (1998); *Sheridan v. Jackson Twp. Div. of Fire,* 10th Dist. Franklin No. 08AP-771, 2009-Ohio-1267, ¶ 4 (Federal and Ohio disability discrimination statutes have the same *prima facie* burden, "are nearly identical, and the Supreme Court of Ohio has held that we may look to cases and regulations interpreting the ADA when interpreting the Ohio anti-discrimination statutes."); *see also* (Doc. #18, PAGEID 709, citing *Kleiber*, 485 F.3d at 868) (Plaintiff conceding that *prima facie* burden is the same for disability discrimination and failure to accommodate). Accordingly, Defendant's Motion is sustained as to Claims One through Three.

## C. Claim Four: FMLA Retaliation

The gravamen of Plaintiff's FMLA claim is that "[t]here was a causal link between Castor's medical leave under the FMLA and Defendant's termination of Castor's employment. . . . Defendant actually terminated Castor for his FMLA use." (Doc. #4, PAGEID 45, ¶¶ 82, 84). To make a *prima facie* case of FMLA retaliation, Plaintiff must show that: (1) he was engaged in FMLA-protected activity; (2) Defendant knew that he was attempting to exercise his FMLA rights; (3) upon learning that Plaintiff was doing so, Defendant took an adverse action against him; and (4) there was a causal connection between the exercise of the rights and the adverse action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 766 (6th Cir. 2012). While normally a Court evaluates an FMLA

20

retaliation claim using the *McDonnell Douglas* burden-shifting analysis, the Court need not do so here, because Plaintiff has not met his *prima facie* burden.

Plaintiff argues that he meets the first two elements by showing that he requested FMLA leave at least five times during his employment. (Doc. #18, PAGEID 718). Plaintiff's recitation of his FMLA history, while accurate, is irrelevant to Claim Four because there was no adverse action connected with those requests; indeed, it is undisputed that Defendant granted those requests each time. Plaintiff concedes, as he must, that the last of those FMLA requests came in April 2020. (*Id.*). Yet, he was not terminated until January 2022. (Doc. #19-1, PAGEID 798-99). A gap of twenty-one months between protected activity and adverse action, without more, does not suggest a causal connection, and Plaintiff cites no caselaw to the contrary. *Cf. Mickey v. Ziedler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) (emphasis added) (citation omitted) ("[T]he fact that retaliation occurs '*very close*' in time after a person engages in conduct protected by [federal employment law] may suffice to satisfy the causal connection requirement.").

Plaintiff attempts to get around this temporal barrier by portraying Defendant's actions from April 2020 until January 2022 as an ongoing retaliation, arguing that "[s]ubsequent to Castor's FMLA leave, Defendant never allowed him to return to work before terminating his employment." (Doc. #18, PAGEID 718). Yet, the undisputed facts above show that Defendant attempted to bring Plaintiff back to work on multiple occasions, but Plaintiff refused. (Doc. #16-1, PAGEID 115, ¶¶ 18, 21). Further, the undisputed facts suggest that any causal connection between requesting FMLA leave and termination was severed by numerous events and disputes between the parties

21

from April 2020 until January 2022, none of which, on their face, related to Plaintiff's exercise of FMLA rights. While "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met[,]" *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000), the length of time and lack of any seeming relationship between Plaintiff's FMLA rights and his termination are too much for the Court to conclude that even a tenuous causal connection, the fourth element, exists. Thus, Plaintiff has failed to meet his *prima facie* burden, and the Court need not evaluate whether Defendant offered a nondiscriminatory explanation for Plaintiff's termination.

In his memorandum *contra*, Plaintiff, perhaps realizing that Claim Four as pleaded is not viable, attempts to recast the adverse action as Defendant placing him on unpaid leave once he took FMLA leave in April 2020. (Doc. #18, PAGEID 717-18, quoting 29 U.S.C. § 2615(a)(2); *Rush v. E.I. DuPont DeNemours & Co.*, 911 F. Supp. 2d 545, 564 (S.D. Ohio 2012) (King, Mag. J.); citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012); Doc. #16, PAGEID 91). Yet, there was no mention in the Complaint of unpaid leave being the adverse action—the only adverse action alleged was termination. Plaintiff's attempt to recast Claim Four thus amounts to a backdoor attempt to amend the pleading. "[T]o the extent a party seeks to expand its claims to assert new theories, it may not do so in response to summary judgment." *Bard v. Brown Cnty. Ohio*, 970 F.3d 738 (6th Cir. 2020), quoting *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). Thus, the Court need not and will not consider this argument. Defendant's Motion is sustained as to Claim Four as well.

**IV.    Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment

(Doc. #16) is SUSTAINED.  Judgment shall enter in favor of Defendant and

against Plaintiff.

The captioned case is hereby ordered terminated upon the docket records of the

United States District Court for the Southern District of Ohio, Western Division, at

Dayton.


IT IS SO ORDERED.

_Walter H. Rice_
_____
WALTER H. RICE, JUDGE
January 31, 2024                UNITED STATES DISTRICT COURT